```
                  IN THE UNITED STATES MAGISTRATE COURT
                     NORTHERN DISTRICT OF INDIANA
                          HAMMOND DIVISION




UNITED STATES OF AMERICA,

      vs.                          2:14-CR-111

KEVIN FORD and
MERCEDES HATCHER,

      Defendants.




            TRANSCRIPT OF PROBABLE CAUSE AND DETENTION HEARING

               BEFORE THE HONORABLE JOHN E. MARTIN

                    UNITED STATES MAGISTRATE

                       HAMMOND, INDIANA

                       DECEMBER 9, 2014
```

Proceedings recorded via CD.  Transcript produced by

computer-aided transcription.

```
 1                      A P P E A R A N C E S

 2

 3   FOR THE GOVERNMENT:

 4           Diane Berkowitz
             U.S. Attorney's Office
 5           5400 Federal Plaza, Suite 1500
             Hammond, IN 46320
 6           (219) 937-5500

 7

 8   FOR DEFENDANT KEVIN FORD:

 9           Scott L. King
             Scott King Group
10           9211 Broadway
             Merrillville, IN 46410
11           (219) 769-6300

12

13   FOR DEFENDANT MERCEDES HATCHER:

14           Ashwin Cattamanchi
             Federal Community Defender
15           31 East Sibley Street
             Hammond, IN 46320
16           (219) 937-8020

17

18

19

20   Kevin Ford and Mercedes Hatcher, Defendants, present in person.

21

22

23

24

25
```

1          THE COURT:  Okay.  We are back in the matter of

2    *United States of America vs. Kevin Ford*, and *United States of*

3    *America vs. Mercedes Hatcher*, 2:14-CR-111.

4       Defendant Ford is here in court with counsel, Scott King.

5    Defendant Hatcher is here in Court with counsel, Ashwin

6    Cattamanchi.  And the Government is represented by its

7    Assistant United States Attorney, Diane Berkowitz.

8       When we last were convened, we were hearing evidence.  The

9    Government, I think, was presenting some evidence in the

10   hearing on the motion to modify conditions of pretrial release.

11   One had been filed by both defendants.

12      Are we prepared to proceed, to continue, Ms. Berkowitz?

13          MS. BERKOWITZ:  Your Honor, my understanding was this

14   was defendants' motion, and they would present, and I would

15   respond to whatever they had, if they had some evidence to

16   support their request to change the conditions of release.

17          THE COURT:  We hadn't actually gotten into the

18   Government's evidence yet.

19          MS. BERKOWITZ:  That's right.

20          THE COURT:  Okay.  So, Mr. King, you were going to go

21   forward, I believe, first?

22          MR. KING:  Yes.

23          THE COURT:  Okay.

24          MR. KING:  Judge, I'd like to submit by proffer.

25          THE COURT:  Yes, that would be fine.

 1          MR. KING:  First of all, with respect to the terms

 2    and conditions of (inaudible).

 3          THE COURT:  You know, on that, Mr. King, what do you

 4    request the Court to do?

 5          MR. KING:  What I'm requesting the Court to do

 6    (inaudible).  So, I mean, I don't know how else to fashion

 7    this.  If -- I mean, I can't believe pretrial services is going

 8    to want to conduct supervised visitation.  The man has a right

 9    to see his child.  Frankly, I think he has a right to see

10    (inaudible).  You know, the Government is counting on

11    (inaudible) what they provided us in discovery, and we thank

12    them.

13       When my client was incarcerated back in 2012 in a state

14    court case (inaudible).  Now, in 2014, since that time, has

15    been (inaudible).

16       Unlike the old days, when an artist (inaudible).  And then

17    promotion, production (inaudible).  That's not how it works.

18    In this day and age (inaudible), he does his own (inaudible).

19    He does his own production.  They typically are done under the

20    auspices of a promoter (inaudible).  Gets the show together and

21    then promotes it.

22       In the exhibit the Government attached in their response

23    to our request to modify, they delineated -- they describe it,

24    in their word, as a posting -- November 8th, 2014, a posting

25    made on behalf of Defendant Ford on Defendant Ford's Facebook

1    page advertising an out on bond, cash bail, in an Illinois

2    strip club, and they attach it.

3        Now, number one, I want to use this as an example of how

4    his music business functions, but, first, I want to point out,

5    as to the Government concedes, he didn't post it.

6        Secondly, I am proffering, I conducted an interview with

7    the promoter.

8            THE COURT:  Did you say the Government concedes he

9    didn't post this?

10           MR. KING:  Well, in their filing, they're saying he

11   didn't -- he said it was made on behalf of -- in paragraph two

12   of the filing.

13           THE COURT:  Okay.

14           MR. KING:  That's the concession at least as I

15   (inaudible).

16       If you look at the exhibit that's attached, the John Doe

17   The King Moseley (inaudible), that's the promoter.  He is the

18   one that posted on my client's fan Facebook page, the promotion

19   for the performance, the new (inaudible) Chicago for November

20   8th, which was a rap performance, and I'm assuming there were

21   other artists, too, including apparently a lady (inaudible).

22   Oh, no.  Let's see here.  There's a couple in here.

23       Anyway, so he didn't post it.  And, in my interview of

24   Mr. John Moseley by telephone yesterday, he acknowledged he's a

25   promoter.  He acknowledged he posted this document.  And,

1    further, on questioning, he said he was not asked to do so by

2    Kevin Ford.  He, in fact, went on to say, "I invest my money in

3    putting together and arranging the acts and putting together

4    the venue.  I do this so I can get my money back and so I can

5    make a profit."

6        But he was very clear in stating in no way, shape, or form

7    (inaudible).  So I want to dispel the notion that's suggested

8    by the Government that their Exhibit A is somehow demonstrative

9    of him having violated the current conditions of release.  He

10   didn't.  He didn't.  It wasn't on his behalf.  Was it to his

11   benefit?  It was, but it was to the promoter's benefit first

12   and foremost.  And, again, in that telephone conversation

13   yesterday, he (inaudible).

14       So his livelihood depends on his ability not only to

15   create rap music but to sell it and to make personal

16   appearances.  "I'm going to be at whatever club this is.  I'm

17   going to be at this club."

18       He, through these meetings, he can sell, he can permit

19   somebody that wants to buy a version of his song to download

20   through a PayPal transaction so the person can go on -- "I want

21   to buy whatever song."  They can through PayPal.  They can, in

22   fact, do it.  They can download it and obtain it.

23       He sells in this direct marketing (inaudible).  He will

24   purchase service from any number of, for want of a better term

25   (inaudible).  I've seen it even, you know, frankly, typically,

1    on a Google situation -- the services of a company that will

2    enhance your position on let's use Google as an example.  If

3    you Google my law firm, or if you Google "Criminal defense

4    attorney, Northwest Indiana," the first ones you see are those

5    that pay Google to advertise.  They literally pay Google for

6    that position.  They have to pay either on a monthly or an

7    annual basis to get that position.  Then below that, the

8    sequence with which they appear are based on a number of

9    criteria under the algorithm that Google employs.  There are

10    companies that you can pay that take and do things (inaudible)

11    move you up the ladder on where you appear.  You can also, on

12    your own (inaudible), if you increase the number of blocks you

13    file, the number of hits you get on your web site.  All these

14    different criteria will move you up the food chain in terms of

15    where you are if somebody Googles it.

16        So he will periodically take money he's earned from the

17    sale of his music or (inaudible) and use that to enlist one or

18    more of these service companies.  They then do what they do to

19    move him up.  So I want a Chicago area rapper.  I'm told

20    there's more than one.  So to enhance his relative position,

21    that's how the business works.

22        So what is he asking for?  He is asking in order to

23    maintain the business he does have -- and I'm not versed in

24    rap, as it turns out, but I have talked not only to his

25    manager, I've talked to (inaudible).  I've talked to several

1    others.  Apparently he's something of a rising star in the

2    market garnering a positive reputation.  He's got the

3    opportunity to work.  He's got the opportunity to sell his

4    music (inaudible).

5        If he cannot go on -- and these are the specifics he's

6    asking.  If he can't go on the face of a fan page and post --

7    and have posted on there promotions about his music and his

8    appearances, Instagram and Twitter, he's effectively eliminated

9    from the ability from the current marketing techniques from

10   working, from earning an income.

11       So those are the requests.  And I would throw out that

12   each one of those, for obvious reasons, are publicly accessible

13   sites.  There's no secret sites that (inaudible).  And we are

14   more than happy to provide each one of those addresses to the

15   Government, or whoever wants it.  They want him on there to

16   make sure what he's posting has to do and is exclusively

17   related to his music business and not in any way, shape, or

18   form to do with anything improper or anything illegal.

19       So that would be the evidence we have.  I'm happy, to the

20   extent of my knowledge, to answer any questions the Court has,

21   to answer them now.

22           THE COURT:  I think I followed what you said.

23   Thank you, Mr. King.

24   Mr. Cattamanchi.

25           MR. CATTAMANCHI:  Yes, Your Honor.  With respect to

```
 1    the contact between the two defendants, I would echo what
 2    Mr. King had stated.  I would add the following information:
 3    For Ms. Hatcher to take her baby to the doctor, it's very
 4    useful for the health of the baby and for the doctor, for
 5    Mr. Ford to also be there.  So this restriction on their
 6    contact if (inaudible) of medical care for the child.
 7              THE COURT:  How so?
 8              MR. CATTAMANCHI:  In that -- well, it's useful for
 9    the doctor to have both parents present when taking care of the
10    baby.  It's whatever the questions the doctors may have that
11    Ms. Hatcher may not be able to answer, Mr. Ford possibly will
12    be able to answer.  Just as a general matter, it's helpful and
13    useful for a medical doctor to have both parents present when
14    dealing with the child.
15        I would also note that -- and I'm not versed in this, but
16    my understanding is that Ms. Hatcher wants, and Mr. Ford, want
17    to have the baby christened.  And my understanding is that for
18    that to happen, it would be beneficial, if not required, for
19    both parents to be there to that event.
20        And, third, it's very difficult for Ms. Hatcher to take
21    care of the baby entirely on her own and then have to arrange
22    through a third party for Mr. Ford to see the baby without them
23    having any contact with each other.  That's caused -- at times
24    it just made it impossible for Mr. Ford to see the baby because
25    Ms. Hatcher and Mr. Ford cannot communicate.  They can't talk
```

1   on the phone.  They can't arrange visits.  They can't have any

2   communication whatsoever.  So it's at times made it impossible

3   for Mr. Ford to see the baby.  It's at times made it very

4   difficult for Ms. Hatcher to go about and run errands that she

5   needs to run.  She cannot find a third party to take care of

6   the baby, where if she were able to have contact with Mr. Ford,

7   she would simply ask, "Can you watch the baby?  I have to run

8   to the store.  I have to run here or there."  And so it's

9   unduly burdensome on her that way as well.

10       And, Your Honor, as I said, I echo what Mr. King has said.

11  We would ask that the Court permit them to have contact.  And

12  as in any co-defendant case, bar improper contact, bar any

13  discussion of the case at hand, and I think that would be

14  sufficient to meet the requirements of the Bond Statute, which

15  is to always be the least restrictive for the condition that

16  would reasonably assure the safety of the community.

17       I don't think the Government has, even with the evidence

18  that they have -- again, that was more than two-and-a-half

19  years ago.  (Inaudible) there's a lot of assumptions being

20  made.  But, regardless, two-and-a-half years ago, there's no

21  allegation that last week, last month, six months ago, a year

22  ago they had any kind of improper contact regarding this case.

23       Now, with respect to the other issues that I'm asking the

24  Court to resolve, there are three other issues.  First, there's

25  no access to any computer.  Second, there's no use of social

1    media.  And the third one, which I did not address in my

2    motion, is disclosure of charges to current or prospective

3    employer.

4         I'll proffer that Ms. Hatcher is now enrolled at an online

5    university.  She would like to complete coursework at that

6    university.  Now, she has done -- she has applied via her

7    phone.  But in order to complete the coursework and to

8    participate in the classes, she needs access to her computer.

9    She needs to use the computer for that purpose.

10        As far as social media, as I note in my motion,

11   Ms. Hatcher, prior to being arrested for this case, had signed

12   up to be a representative for Avon.  And in order to do that,

13   she needs to -- she had set up a Facebook page, and my

14   understanding is that the way Avon works, you act as sort of an

15   independent contractor.  You advertise and sell Avon products

16   on your own.  And one of the means of advertising, in fact, the

17   primary means for advertising is Facebook and other social

18   media.  So not permitting her access to social media really

19   prevents her from pursuing her course of work that she's

20   interested in.

21        And I would also note, as I did in my motion, that there's

22   nothing in the indictment that, or in the complaint, that

23   alleges any improper use of social media by Ms. Hatcher.

24   There's no relation whatsoever.  The bond condition that's

25   imposed does not in any way reasonably assure the safety of the

1   community, the safety of the community with respect to

2   Ms. Hatcher.

3        Finally, Judge, with respect to the third issue of

4   disclosure of the charges with respect to employers.  If an

5   employer is interested to know about whether an employee, or

6   prospective employee, has any charges, that employer will ask.

7   And I'm not sure that the course of mandate that Ms. Hatcher

8   disclose the charges of conduct, that being the employer

9   (inaudible).

10       Thank you.

11            THE COURT:  All right.  Thank you, Mr. Cattamanchi.

12       Ms. Berkowitz.

13            MS. BERKOWITZ:  Your Honor, is it all right if I stay

14   at counsel table?

15            THE COURT:  Sure.

16            MS. BERKOWITZ:  I guess I'll try and take these one

17   by one.  The first would be the conditions of release as it

18   relates to the social media.  This Court put into place, after

19   some extensive discussion within the Court, a requirement that

20   is contained in black and white within this Court's order

21   setting out the conditions of release.  It is on page 2 of the

22   order, and it specifically says, "In addition to not opening

23   any new credit cards or financial accounts or lines of credit,

24   no access to any computers at all besides cell phone," period.

25       "No use of social media and no social media postings by

1    yourself or third party on behalf of defendant," period.

2         That was put in place on October 30th, 2014.  On

3    October -- on November 8th, there's a posting, which is

4    attached to a pleading, and if the Court doesn't have it, I

5    have a copy of it.

6              THE COURT:  I have it right in front of me.

7              MS. BERKOWITZ:  It's a posting on Defendant Kevin

8    Ford's Facebook page by someone by the name of John Doe The

9    King Moseley.  I don't know if he's related to a Mr. Matt

10   Moseley, who is a defendant out of Chicago in the same cracking

11   cards conduct, but it is -- it states -- it's bandmancomehome,

12   and it's bandmankevo.  The sponsors are Power Move, L.T.

13   Entertainment, Band Plan, which happens to be Defendant Ford's

14   operation.  Presenting bandmankevo out on bond, cash bar.

15   Performing -- I'm sorry -- cash bash.  Performing "Baller In

16   Me," which is one of his older rap records, and "Want To Be

17   King Louie."  Again, older.  This is not new music.  But this

18   is clearly for the benefit for the defendant.  The defendant is

19   sponsoring it, and this is done after the Court already put

20   something in place telling him, "Don't do that."

21        Now, the Government, certainly -- and this Court would be

22   within its rights to say, "Well, you violated the terms of your

23   release.  You clearly can't comply with even this.  We should

24   revoke you."

25        I'm not asking to revoke the defendant, Your Honor, but

```
 1   I'm asking to keep in place the conditions that you put there
 2   and you put for a reason because contrary to what counsel has
 3   said, it is very clear from the indictment that these
 4   defendants have used social media rather extensively and
 5   creatively to obtain access to information that they have then
 6   used to commit their criminal conduct, specifically recruiting
 7   people to give them their bank cards and their PIN numbers, and
 8   Defendant Hatcher is no less guilty of that herself.  While she
 9   hasn't -- well, we have her using her phone to send out those
10   same kind of text messages, those same kind of messages that
11   we've seen on Facebook postings by bandmankevo, Defendant Kevin
12   Ford, and his co-defendants.  And there was no effort prior to
13   issuing this posting on Facebook to ask the Court, "Hey, do we
14   have permission to do this?"
15       After the fact, after this has already happened, after
16   money has already been obtained, after the parties happened at
17   the strip club, the defendant then comes to you and says, "Oh,
18   you know what?  We changed the terms of our release and our
19   access to social media."
20       The horse is already out of the barn, Your Honor.  I think
21   the conditions that you've put in place are appropriate given
22   the nature of this case, and there's no reason why they should
23   change especially when we get to the other requirements that
24   the Court's put in place, and that has to do with no contact
25   amongst the defendants.
```

```
 1        Oh, I'm sorry.  Maybe I should -- just backup.  Just one
 2   more thing on the social media.  Counsel seems to be asking for
 3   the ability of Kevin Ford to use money to effectively pay
 4   people to like his music.
 5        The Government, and I'm proffering, has evidence.  The
 6   defendant has a PayPal account, and so does Ms. Hatcher, which
 7   they've used to pay people to like the defendant's music.  I
 8   don't know who really likes the defendant's music.  If it's
 9   just the people that he's paid to like, or if he actually has a
10   following, but that's almost besides the point.  It's the
11   access to social media.  It does not appear to be a necessity
12   when the defendant himself has a manager, representative,
13   Twista, I think is his name.  He's an old-time, recognized rap
14   artist from the Chicagoland area.  Certainly, if the
15   defendant -- and the defendant has identified himself as
16   working with Twista, he can use to post something about any
17   kind of concerts he's giving.  He can certainly use that
18   individual's website to put out there that he's got a concert,
19   or he's working with Twista.
20        I'm sorry.  Getting back to the contact amongst the
21   defendants.  There's a reason why this is in place, and the
22   Government has phone messages from when the defendants -- Kevin
23   Ford and Cortez Stevens were arrested in April of 2012, and
24   they were transported to the Lake County jail.  They were
25   arrested for conduct directly related to cracking cards.  In
```

```
 1    fact, that is in the indictment in this case.  What they did is
 2    they had Mercedes Hatcher, in particular Kevin Ford and
 3    Mercedes Hatcher had many phone calls from the jail where
 4    Mr. Hatcher -- Mr. Ford is directing Ms. Hatcher on things to
 5    do.  He needed some -- and I have a -- I can play the CD, Your
 6    Honor.  They're very long.  Or I can just give them to the
 7    Court.  I can proffer what's in the CDs.  There are two of
 8    them.  It would be Exhibit 1A and 1B.
 9            THE COURT:  I mean, I don't want to cut you off, but
10    I don't want to cut off the Defense either, but is it possible
11    that you could just proffer what's in there, and then they can
12    respond by proffer?
13        I mean, you've all had the opportunity to listen to these,
14    and I don't know that -- it's probably more pertinent,
15    actually, for you folks.  But if there are parts that you
16    wanted me to listen to, I would, but if you really want to just
17    proffer what it says, and then they can respond to it, and if
18    there's some major dysfunction between what we think it says,
19    then play for me what you need.
20            MS. BERKOWITZ:  I could proffer.
21            THE COURT:  Is that okay, then, Ms. Berkowitz?
22    Mr. King?  Mr. Cattamanchi?
23        Okay.
24            MS. BERKOWITZ:  On April 24th, 2012, there's a
25    phone call at 9:19 between Defendant Ford and Defendant
```

1    Hatcher, and the question -- among the questions that Ford asks

2    of Ms. Hatcher is, "What about my Maserati?"

3        Hatcher is being directed by Ford to make sure that the

4    Maserati is put away, hidden from law enforcement authorities.

5        Your Honor, I'm going to proffer that that Maserati was

6    purchased with proceeds from the criminal activity for which

7    this defendant was charged.  And, in fact, the Government

8    subsequently was able to find that Maserati, and it was

9    forfeited, civilly forfeited.  The Maserati was taken;

10   defendant never contested it.  It is now in the possession of

11   the United States Government.

12       In addition to directing to hide the Maserati, put it in

13   storage, take it away, there is a conversation, and Hatcher is

14   telling Ford, "Your mother said take it out of Indiana."

15       There's another conversation that occurs between Hatcher

16   and Ford -- two conversations April 23rd, 2012.  There's one

17   phone call at 1433, and then another one at, I believe, 1913.

18   1914.  And the call that occurs at 1433 on 4-23, Ford --

19   Hatcher is telling Ford she has two moves the next day.

20       The Government is going to proffer that those moves relate

21   to the criminal conduct that's involved in this case.  This is

22   moving money, moving, getting checks deposited, getting

23   payments through, cashing out of money orders.  She said that

24   she missed the mail so she had to redeliver it.  She tells --

25   Ford tells Hatcher, "You got it?  Tell Cortez" -- who is Cortez

1   Stevens, a defendant in this case, who was also, as I said,

2   arrested back in April of 2012 -- "no talking."  Hatcher said

3   that she's at home on the computer.

4       We believe that the home she's referring to is the home in

5   Merrillville that we subsequently searched and found a

6   computer, found photographs of Defendant Cortez Stevens at, and

7   also the indication that both Defendant Ford and Defendant

8   Hatcher used that same computer.

9       Hatcher is telling Ford that she got off the phone with

10  Cortez, that he told her to get the phone number for an unknown

11  individual named Garland.  Hatcher says she has one of those

12  CDs for the next day.  We understand "CD" to be a certified

13  deposit, and by that I mean a deposit that would be accessed

14  only immediately.  These are deposits where the routing number

15  is for a large corporation or a government entity where the

16  bank will pay almost immediately upon the check being

17  deposited.

18      Ford asked Hatcher if she's paid the storage lady.  And

19  also he tells her -- he's got an Audi.  He tells her that he

20  wants her to call his mom tomorrow and to have her put the Audi

21  in her name.  Again, hiding assets.  These are proceeds -- he

22  purchased that Audi with proceeds from criminal activity.

23      Ford tells her that "Darius knows how to crack CDs and

24  pins."

25      Ford tells Hatcher to make sure to clean up, to get all

1    the trash out of there.  And we understand that to mean to get

2    all the evidence out of the apartment.

3         Hatcher tells him, "It's too late.  It's already gone."

4         That he asked her about the thing behind the computer.

5    She says she's already on it, and it's gone.  And then Ford

6    tells Hatcher to get some paper.  Paper we understand to mean

7    the bonded paper that is used to create these phoney checks the

8    defendants deposit and then subsequently cash.

9         Just from those conversations, it is clear that these

10   defendants have, in the past certainly, colluded in order to

11   further engage in criminal activity.

12        Now, I understand that the defendant and his girlfriend,

13   Ms. Hatcher, had a child, but at the time of this indictment,

14   the defendant and Ms. Hatcher were separated.  They were not

15   living together.  Ms. Hatcher was living in Danville, Illinois,

16   which I understand she still lives.  She has parents there, and

17   her parents have supported her and helped her with her child.

18   I'm not sure why the sudden need for immediate access to

19   Defendant Ford.

20        We're not trying to prohibit him from having access to his

21   child, and I think in the conversation that we had initially

22   regarding the terms of supervision, the Court made it clear

23   that he certainly can, but there has to be some parameters on

24   it.  It is not an opportunity to engage in conversation about

25   the case or to collude about a defense, it is only an

1    opportunity to hand off the child, and that's it.  This new

2    found need to be together is only since the indictment, Your

3    Honor.

4         If I may have just one minute.

5         We have some information from the condo manager of the

6    defendant's building telling us that Ms. Hatcher has not been

7    around for some time, so -- prior to the arrest.  So there's

8    no -- it seems kind of unusual that all of a sudden we are

9    hearing that there's a need for this interaction which didn't

10   previously exist.  We're not asking, Your Honor, to revoke the

11   defendant.  We're not asking -- we didn't ask to have them

12   incarcerated even though we knew that there was a prior

13   collusion that was involved in this case.  We're just asking

14   for the Court to keep in place the rules that you've set

15   regarding the use of social media and the contact amongst

16   defendants.

17        Thank you.

18            THE COURT:  Thank you, Ms. Berkowitz.

19        Further proffer or evidence, Mr. King or Mr. Cattamachi?

20            MR. CATTAMANCHI:  I would just note, Judge, that

21   Ms. Hatcher lives in Calumet City, Illinois, with her aunt.

22   She does not live in Danville.  And I would just note that

23   she's been in a four-year relationship with Mr. Ford, and that

24   they've lived in different locations, but they're not --

25   they've never been separated.

1          THE COURT:  Okay.  Have they never lived together?

2          MR. CATTAMANCHI:  They have lived together at times,

3    and, I mean, right now, she's living with her aunt in Calumet

4    City, Illinois.

5          THE COURT:  Okay.  All right.

6       Anything further on that, Ms. Berkowitz?  Proffer?

7          MS. BERKOWITZ:  Just one thing.  You know, as we were

8    investigating this case, we checked the Facebook page for both

9    of them, and they were not Facebook friends, which is an

10   indication of the sort of rupture in the relationship prior to

11   the indictment.

12         THE COURT:  Okay.

13      Mr. King, anything further?  Proffer?

14      Okay.  Mr. Cattamachi?

15         MR. CATTAMANCHI:  No, Judge.

16         THE COURT:  I'll keep going around until someone

17   doesn't have anything to say.  We are at that point.

18      Okay.  Argument any further?

19      I mean, there's been argument interspersed.  Is there

20   anything further you would like to say by way of argument?

21   Mr. King?

22         MR. KING:  (Inaudible).  What the word "paper" meant

23   (inaudible) and this whole social media thing.  First of all,

24   (inaudible).  If I understood one suggested argument by the

25   Government is that my client is taking his money and paying

1    people to like his music.  That is not exactly what promotion

2    is.  Promotion is a sum to promoters to services as they went

3    through to enhance one's stance on Google and other outlets in

4    order that more people buy more music so that you actually net

5    a profit as opposed to have a wash or end up spending money at

6    a loss in your endeavor.

7        So I'm not sure I -- you know, we proffered.  He is paying

8    for promotion.  There's no question about it.  His most recent

9    live appearance had in excess of 4,000 people in attendance.

10   There are other artists as well.

11       The Government -- this I really didn't understand.  Really

12   didn't understand.  The Government is contending, without any

13   evidence, that the Exhibit A they attached to their filing,

14   which I think the consensus is John The Doe King Moseley posted

15   on his web page.  I don't think there's any question about

16   that.  And notwithstanding the fact that apparently the only

17   person that has spoken to John The Doe King Moseley (inaudible)

18   is me who said, "I did it for my own promotional interest.  I

19   was not asked to do so by Mr. Ford."

20       Now, apparently, the Government's interpretation of the

21   language in the current restriction is posted by third parties

22   on behalf of the defendant.

23       What "on behalf" means, I think, is significant.  I hope

24   the Government isn't suggesting that he has culpability,

25   liability in some form or format because some other person with

1   their own self-interest did a posting without any communication

2   or any incentive or inducement by the defendant.

3       Now, if that's the interpretation, then that definitely

4   has to be changed.

5       But it was a curious bit of presentation by the

6   Government.   In the same breath, they're suggesting because

7   there's other artists that he performs with, and to my surprise

8   one by the name of Twista was named, that the Government

9   suggested, if I understood this correctly, Twista, Twister,

10  Twista.   Whatever his name is.

11      Is it a him?

12      That Twista could do the promotion for my client.   Well,

13  why could Twista do the promotion for my client and not run

14  afoul of the Government's interpretation of the conditions of

15  release but John The Doe King Moseley can't?   (Inaudible).

16      But the second piece is Twista is a competitor of my

17  client.   He's another rap artist.   Why would a competitor want

18  to promote my client's business?   The answer is he wouldn't.

19  He wouldn't.   He has no interest in doing so.

20      What we're asking -- the man has the right to make a

21  living.   The way he makes a living, a legitimate living of

22  necessity involves three social media -- access to three social

23  media outlets, which I delineated earlier, each of which is

24  completely accessible, reviewable, monitorable by any agency of

25  the Government that so chosed to do so.   And notwithstanding

 1     that, the Government is saying, "No, he can't do that."

 2         Look, I can use a computer for any number of purposes.  I

 3     can use it improperly to have wrongful communications with a

 4     terrorist organization.  I can use it to access cute videos of

 5     kittens playing pianos.  In his case, he is willing to have all

 6     of that monitored, all of it subject at any moment to be looked

 7     at to see what he is doing and to be prepared in front of this

 8     Court, in front of the District Court, in front of whomsoever

 9     to show, "I've not done anything except legitimately earn a

10     livelihood."

11         And given those circumstances, and given the state of the

12     evidence in this matter, Your Honor, I respectfully suggest

13     that his request is reasonable, and denial of that request for

14     that limited purpose, both to interact with the co-defendant

15     and limited access as we've laid it out here to social media

16     for his livelihood between, you know, while this case pends and

17     moves forward, would be unreasonable, and we respectfully ask

18     for the Court to grant both requests of modifications as to

19     Defendant Ford.

20         THE COURT:  Thank you, Mr. King.

21         Mr. Cattamachi, do you have any further argument?  I know

22     it was interspersed as well, but --

23         MR. CATTAMANCHI:  Just a brief point.  I think it's

24     important to separate Ms. Hatcher from -- to treat her

25     independently, separate from other co-defendants, and I say

1    that because I think she should have access to the computer,

2    access to social media without any requirement to monitor.

3         There's no allegation, as far as I can tell from the

4    complaint, that she has abused use of the computer or social

5    media in any way relevant to the offense.  So I think there's

6    no reason whatsoever that she should not be able to use the

7    computer even if she didn't have this course as she's enrolled

8    in, and she should be able to use social media even if she

9    didn't have employment that she's pursuing through Avon.

10        But she does have those.  I proffer that she is pursuing

11   that coursework and that employment, and so we would ask for

12   modification of bond conditions to permit her to use social

13   media and use the computer without any monitoring.

14        Thank you, Judge.

15             THE COURT:  Thank you.

16        Ms. Berkowitz.

17             MS. BERKOWITZ:  Just a couple of things.  Your Honor,

18   I'm not sure when Defendant Hatcher signed up for the online

19   class, but, you know, if she signed up for it after she was

20   already prohibited from using social media and a computer, it

21   seems rather absurd.  She was already under an order that said

22   she couldn't do that.  So she should've asked for permission.

23        As far as her business Avon, she sat in court, Your Honor,

24   and told you she wasn't making any money.  She had a Facebook

25   page, but she said she wasn't making any money at it.

1    Defendant Ford says that Twista is a competitor.  That I
2    don't find believable given the fact that the defendant signed
3    with G & G Entertainment, which is owned by Twista.  And, in
4    fact, the BMW that he drives and is sitting in the parking
5    garage of his condominium is actually owned by Twista.

6    I guess I don't think we're getting very accurate
7    information from defendants, and I think that there is a
8    disregard for the rules that this Court put in place that are
9    the least onerous on them to allow them to remain out.

10    Again, Your Honor, the Government would ask that these
11    defendants be held to the conditions that the Court put in
12    place.  And if there are any questions about what is on those
13    jail tapes -- the Government has the CDs -- I don't want the
14    Court to just accept at face value what I'm telling you.  You
15    can hear for yourself.  It is plain as day when you hear it,
16    that the defendants, Hatcher and Ford, are colluding; that they
17    are colluding by destroying evidence, hiding proceeds from
18    criminal activity.  So there's a pattern.  There's a history
19    there between these two defendants.  And what the Government is
20    asking simply to separate them, to not have them interact on
21    anything other than just handing off of their child, and to
22    prevent them from using social media is not too onerous for
23    these defendants.

24    If the Court would like to have those CDs, I'm happy to
25    provide them to the Court if there's any question about the

```
 1    representations to what's on there from the jail calls.
 2              THE COURT:  All right.  Thank you.
 3         Mr. King, anything further?
 4              MR. KING:  No, Your Honor.
 5              THE COURT:  Mr. Cattamachi?
 6              MR. CATTAMANCHI:  Just to make a quick point, Judge.
 7    As I proffered, Ms. Hatcher signed up for this course via her
 8    phone.  So she did not use a computer to sign up for the
 9    course.
10              THE COURT:  Correct.  But she's allowed to use her
11    phone.
12              MR. CATTAMANCHI:  Correct.
13              THE COURT:  But she did sign up for it after the
14    restriction was placed.
15              MR. CATTAMANCHI:  There's no restriction on her using
16    a phone.
17              THE COURT:  If it's an online -- she's not allowed to
18    be online.
19              MR. CATTAMANCHI:  No.  There's only restriction on
20    her use on social media.  There's no restriction on her being
21    online.
22              MS. BERKOWITZ:  It says "computer."
23              THE COURT:  Computer use.
24              MR. CATTAMANCHI:  Computer.  I assume that --
25              THE COURT:  You're asking for an exception so that
```

1    she can do an online course?

2            MR. CATTAMANCHI:  Right.  I'm asking for that

3    exception, but as of now, there's no use -- restriction on her

4    use of a cell phone to sign up for the course online.  Her

5    phone can access the Internet.

6        A computer is a laptop or a desktop as far as I -- that's

7    what I advised Ms. Hatcher.  So if she violated, then I advised

8    her to violate.  But I advised her --

9            MS. BERKOWITZ:  (Inaudible) that there's a violation

10   because Defendant Hatcher used her cell phone to sign up for

11   the class.  We're just saying -- she signed up for an online

12   class when she knew she was prohibited from using the computer.

13           THE COURT:  She didn't violate, but she signed up for

14   something that if she went in and did it, it would be a

15   violation.

16           MR. CATTAMANCHI:  Right.  And I advised her to sign

17   up for the course with the view that I would attempt to seek

18   modification of the bond conditions to permit her to complete

19   the course.

20           THE COURT:  Okay.  That's what I understood.

21           MR. CATTAMANCHI:  Right.

22           THE COURT:  Okay.  The problem is is that we have

23   very serious crimes that are alleged against both defendants,

24   and culpability and how much one or the other is involved gets

25   muddled, and some may be more culpable than others, but that

1    doesn't mean that one of the others couldn't talk the other

2    person into being more culpable and being more active.  And,

3    unfortunately, there's a lot of things -- as we all know,

4    there's a lot of things you can do with a computer.  There's a

5    lot of legitimate things that can be done both professionally

6    and socially, but also there are illegitimate things that can

7    be done.  And the allegations are, and the proffers have been,

8    and what the Government believes will be the evidence, is that

9    the defendants used the social networking sites like Facebook

10   and Twitter and Instagram, YouTube, different, to recruit

11   others to engage in these frauds.

12        And so if you have a business that has been used as both a

13   legitimate business and then -- but also as a fence for

14   illegitimate purposes, it's not unreasonable as a condition of

15   bond to make that business be closed and take that away.

16        The probation office -- the Government can't be there at

17   all moments to listen to every conversation to know exactly

18   what is meant by, "Come to this place or this party," and then

19   what conversations flow from that.  And it just seemed -- it

20   just seems like the recruitment of people for these schemes is

21   just similar to the recruitment for anything.  And it's in the

22   minds of these defendants what their intent is, and I'm not so

23   sure that the Government or the probation department can just

24   sort that out effectively enough to make sure that there's no

25   danger that they're going to be committing these very serious

 1    crimes again, or recruiting others to commit the crimes on

 2    their behalf.  Or if, you know, Mr. Ford doesn't have access to

 3    the Internet, then if Ms. Hatcher does, even in the short

 4    period of time that they're allowed to pass child or talk about

 5    the child, or on the way to the doctor's office not also talk

 6    about recruiting people for illegal activity, and the illegal

 7    activity went on for a lengthy period of time.  And,

 8    apparently, there were arrests and forfeitures of cars, and the

 9    illegal activity continued.  That's what the Government is

10    saying.

11        So those are the concerns in fashioning the conditions of

12    bond.  Those are some of the concerns, and none of that has

13    been alleviated.  I mean, I understood at the time when I made

14    the order very similar things to what we're talking about here;

15    that this would be difficult, potentially, for the defendants,

16    but it appeared necessary then and it appears necessary today.

17    So those conditions of the bond still remain.

18        I'm going to sustain those.  They still remain in full

19    force and effect, and the defendants are cautioned that if they

20    violate those terms, their bond could be revoked and they then

21    could be detained pending their trials.

22        With regard to the child, that we have to have -- we have

23    to have an ability to visit with the child, that they are

24    parents of the same child.  They have to have an ability to

25    relieve each other, baby-sit, pass the child off, to talk about

 1   relevant things about the child to the benefit of the child.

 2   The child needs to visit with -- the child needs to visit with

 3   father and mother.  So under that circumstance, they will be

 4   allowed minimum contact with regard to talking about

 5   visitation, exchanging visitation, doctors' visits and things

 6   to the benefit of the child.  Before doing those interactions,

 7   let the probation officer know.  If the probation officer is

 8   not available to actually talk to, leave a message.

 9       Is that okay with probation then?  Is that reasonable

10   that --

11            PROBATION:  That's fine.

12            THE COURT:  And -- yeah, that's the way to do it.

13   Just let the probation officer know a time frame when and what

14   contact that's going to be, and it's only for the purpose of

15   their child.  You're not allowed to discuss anything

16   obstructing with regard to the case, and both defendants are

17   warned that they shall not have any contact with other

18   co-defendants as well, and violations of that would mean a

19   revocation of the bond.

20       All right.  Mr. King, any questions?

21            MR. KING:  Two things.  First of all, I am going to

22   request a written order (inaudible).  But we need some

23   guideposts here so this kid is not unwittingly running afoul.

24       The second specific inquiry in terms of the language

25   that's being used here, you have the Government contending that

1  a third party unrelated to this case did a posting for their

2  own purpose, this whole poster thing you saw as Exhibit A.  Is

3  the Court construing it as a violation of the terms of, by, or

4  on behalf of if it is done by a third person without impetus,

5  request, in any way, shape, or form by the defendant?  We need

6  to know this going forward so I can do my job.

7          THE COURT:  It's on his behalf because even though

8  the production company benefits, he also benefits.  I mean,

9  it's advertising his concert.  So it is on his behalf.

10          MR. KING:  But in that context of being on his

11  behalf, it being done by a third person without any

12  relationship whatsoever to the allegations in this case could

13  not possibly be utilized for improper purpose, and that's why I

14  am having trouble following that interpretation.

15          THE COURT:  But if it's posted, he's not supposed to

16  be using Facebook anyway.  So if it's posted --

17          MR. KING:  He's not.

18          THE COURT:  But if it's posted on his Facebook site,

19  he has the power to close down his Facebook site.

20          MR. KING:  And thereby voluntarily (inaudible).

21          THE COURT:  Well, I mean, he's not supposed --

22  pardon?

23          MR. KING:  Impoverishment.  This is how he makes

24  money.  I mean, that's why I'm suggesting perhaps some more

25  thought be given here because, with all due respect to Your

1    Honor, I am unaware of a case, in my experience, where there is

2    a legitimate business that is alleged to have engaged, in

3    addition to a legitimate part, an illegitimate part, and the

4    terms and conditions of pretrial release caused it to go

5    completely out of business.  I am unaware of a case.

6            THE COURT:  Mr. King, your client is the business

7    itself.  He's the one that's the performer.  If he were

8    incarcerated, then we would know that he wasn't able to be out

9    on the street and potentially doing the criminal conduct that

10   the Government is alleging that he has been doing.  So that

11   would effectively close down his business.

12       Under the circumstance, he was granted a bond so long as

13   he wasn't able to continue that type of enterprise, and the

14   condition that was laid out on the bond was that if he didn't

15   have use of the computer and use of Facebook, then we -- the

16   Court was satisfied that it would eliminate at least that

17   aspect of what the Government was alleging that he had done.

18           MR. KING:  Okay.  So while that helps give some

19   guidance, but what the Court is doing is a blanket

20   prescription, a blanket prescription without regard of who does

21   it or what's done.  Before we knew about the what's done.  Now

22   we know that no one can make any posting on anything that he's

23   affiliated with without regard to him having had any

24   involvement whatsoever.  And that's why I'm asking for a

25   written ruling so that the district judge can be as best

```
 1    informed for all of our sake.

 2            THE COURT:  Correct.  And I will do a written order.

 3            MR. KING:  Thank you.

 4            THE COURT:  Anything further, Mr. Cattamachi?

 5            MR. CATTAMANCHI:  I would just ask clarification.  So

 6    is Ms. Hatcher prevented from using a computer to complete her

 7    coursework but she can use her cell phone?

 8            THE COURT:  She's allowed to use her cell phone

 9    because she needs to make phone calls and talk to people.  She

10    has a child.  She has to communicate with people, but the

11    computer aspect of the phone shouldn't be used.  It's just --

12    without making her get a new phone that didn't have a computer

13    on it, it's just not -- you're just not able to do it.  So

14    that's why I said that they could use their cell phones.  I

15    want them to be able to communicate at least in some way.

16            MR. CATTAMANCHI:  Can she use email?  She's not

17    allowed to be online?

18        As far as I understood, "no access to any computers," I

19    understood that to mean a desktop computer or a laptop

20    computer.  I didn't understand that to restrict her to the use

21    of her phone.

22            THE COURT:  But the phone is a computer as well.

23            MR. CATTAMANCHI:  So is the Court restricting her use

24    of her phone to only making telephone calls, because she

25    communicates with her instructor via email using the phone?
```

```
 1    She completes the initial assignment she was able to do via the

 2    phone.

 3              THE COURT:  She signed up for a computer course, a

 4    course that's done online after it was restricted from her to

 5    be online.

 6              MR. CATTAMANCHI:  I didn't understand that it was

 7    restricted for her to be online.  That's not how I read the --

 8              THE COURT:  You're online through a computer.  Just

 9    because your phone also has computer-like functions --

10              MR. CATTAMANCHI:  Okay.  So she's not allowed to

11    use --

12              THE COURT:  She's allowed to use the phone to talk

13    with people on the phone, but she's not supposed to be on a

14    computer or online.

15              MR. CATTAMANCHI:  Okay.

16              THE COURT:  Any other questions?

17              MR. CATTAMANCHI:  No.

18              THE COURT:  Mr. King?

19              MR. KING:  Text messaging is a function --

20              THE COURT:  Text messaging is the same thing as a

21    phone.  And so text messaging is okay, yes.

22         And the probation officer, you've been wanting to say

23    something.

24              PROBATION:  Aside from that, I just want to make sure

25    what the order was for them to contact us for child
```

1    (inaudible).

2           THE COURT:  Just to let you know --

3           PROBATION:  When they're meeting or all contact on

4    the --

5           THE COURT:  Just to let you know that they're going

6    to be meeting or they're going to be talking about the child,

7    visitation with the child.

8           PROBATION:  Thank you.

9           THE COURT:  Would it be better if I put a limit on

10   how many times, or is that undoable?

11      Counsel, do you have any question about that?

12          MR. CATTAMANCHI:  No.  I think, you know, we'll see

13   how it goes.  I think she'll contact probation if she needs to

14   contact Mr. Ford.

15          THE COURT:  Correct.  If she -- and they're going to

16   set up a visitation, and then just contact and tell probation.

17      All right.  Mr. King?

18          MR. KING:  Nothing.

19          THE COURT:  All right.

20      Ms. Berkowitz, yes.

21          MS. BERKOWITZ:  Your Honor, I just want to point out

22   something based on what Mr. King said.  The Facebook posting

23   that is posted on Defendant Ford's Facebook page, it is a

24   picture of him, and it identifies the presenters.  Among the

25   presenters is Bandplan.  That is Kevin Ford's business, his

```
 1    company.  So it is disingenuous to claim that the defendant did

 2    not benefit, or he was not in any way involved or knowledgeable

 3    about this since he's among the presenters.

 4              THE COURT:  Okay.  Mr. King.

 5              MR. KING:  Nobody said they didn't benefit.  What was

 6    said was he didn't initiate, encourage, (inaudible).  And that

 7    I do stand on.  There's nothing from the Government's offer

 8    that would suggest (inaudible).

 9              THE COURT:  All right.  But it's clear now.

10        All right.  Thank you.

11        (Hearing concluded.)

12

13

14

15

16

17                   CERTIFICATE OF REPORTER

18       I, Richard D. Ehrlich, a Registered Merit Reporter and

19    Certified Realtime Reporter, certify that the foregoing is a

20    transcript of the CD transcribed to the best of my ability.

21

22    s/Richard D. Ehrlich                   January 23, 2015
                                                             _____
23    Richard D. Ehrlich, Official Reporter               Date

24

25
```